THE PEOPLE'S LAW FIRM, PLC
Stephen D. Benedetto (Ariz. Bar No. 022349)
645 North 4th Avenue, Suite A
Phoenix, Arizona 85003
Telephone: (602) 456-1901
Facsimile: (602) 801-2834
benedetto@the-plf.com

*Firm email for docketing purposes:*
admin@the-plf.com

*Attorneys for Plaintiffs Jamaar Williams*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jamaar Williams, | Case No. |
| Plaintiff, | |
| v. | **COMPLAINT FOR VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)** |
| City of Phoenix, a municipal corporation, | |
| Jeri Williams, Chief of Police of the Phoenix Police Department, in her individual capacity, | |
| Joseph Gage, a City of Phoenix Police Officer, in his individual capacity, | |
| Darrell Magee, a City of Phoenix Police Officer, in his individual capacity, and | |
| Francisco Barrios, a City of Phoenix Police Officer, in his individual capacity, | |
| Defendants. | |

For his Complaint against Defendants City of Phoenix, Jeri Williams, Joseph Gage, Darrell Magee, and Francisco Barrios, Plaintiff Jamaar Williams, through undersigned counsel, hereby alleges as follows:

**OVERVIEW**

1. "Political Prosecution." It is a phrase that evokes images of fascist dictators and unchecked power. And for good reason: There is likely no act of government misconduct more antithetical to a free republic than the government leveraging the full weight of its law enforcement apparatus to ruin a political opponent. This is a case about the highest levels of the Phoenix Police Department doing exactly that.

2. On July 12, 2019, Phoenix Police Officers illegally arrested a Black Lives Matter leader and trusted community lawyer while he was serving as a Legal Observer at a peaceful protest. When their actions were questioned by City Council, the highest levels of the Phoenix Police Department – including the Chief of Police herself – were forced to take a collective breath, review the evidence, and explain the arrest.

3. Rather than identify the wrongful arrest as an overreaction and correct it, however, the highest levels of the Phoenix Police Department doubled-down on the officers' misconduct: colluding to lie, falsely represent evidence to City Council, and maliciously prosecute Mr. Williams of felonies he did not commit in an effort to destroy him and fracture the movement he has helped lead.

4. After nearly six weeks of this illegal prosecution – a period of time when Mr. Williams' freedom, career, and life's work hung in the balance – a Maricopa County Superior Court judge threw the prosecution out of court, finding all charges to be unsupported by probable cause. Since then, the most substantial ramification the Phoenix Police Department has had to bear for its egregious abuse of the constitution and public trust has been its own waste of time and resources. This lawsuit aims to make clear that, when our public employees engage in vexatious and baseless prosecutions of their political enemies, they must bear a far greater cost.

**JURISDICTION AND VENUE**

5. Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343(a)(3)(4) and 1367(a). This Court has jurisdiction over Plaintiff's claims for violation of Plaintiff's civil rights under 42 U.S.C. § 1983, and pendent jurisdiction over his state law claims pursuant to 28 U.S.C. § 1367(a).

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 in that the acts and omissions that give rise to this action occurred within this District and this Court otherwise has jurisdiction.

7. This case presents an actual case in controversy arising under the Fourth Amendment to the United States Constitution, and under the provisions of 42 U.S.C. §§ 1983 and 1988.

**PARTIES**

8. Plaintiff Jamaar Williams is an unmarried man residing in Maricopa County, Arizona.

9. Upon information and belief, Defendant Jeri Williams is the acting Chief of Police of the Phoenix Police Department, working and residing in Maricopa County, Arizona.

10. Upon information and belief, Defendant Joseph Gage is a sworn police officer for the City of Phoenix, working and residing in Maricopa County, Arizona.

11. Upon information and belief, Defendant Darrell Magee is a sworn police officer for the City of Phoenix, working and residing in Maricopa County, Arizona.

12. Upon information and belief, Defendant Francisco Barrios is a sworn police officer for the City of Phoenix, working and residing in Maricopa County, Arizona.

13. Defendant City of Phoenix (the "City") is municipal corporation created under the laws of the State of Arizona. The City maintains and operates a law enforcement agency known as the City of Phoenix Police Department ("PPD").

14. The City is under a duty to run its law enforcement activities in a lawful manner so as to preserve the peace and to preserve for its citizens the rights, privileges, and immunities guaranteed and secured to them by the Constitutions and laws of the United States and the State of Arizona.

15. The City has established and implemented, or delegated to PPD the responsibility for establishing and implementing, policies, practices, procedures and/or customs used by law enforcement officers employed by the City regarding the investigation, detention, arrest, and use of force during law enforcement operations.

16. Every act and omission of the employees, representatives, and agents of Defendants detailed in this Complaint was performed under the color and pretense of the Constitutions, statutes, ordinances, regulations, customs and uses of the United States of America, the State of Arizona, and the City of Phoenix, by virtue of their authority as sworn officers, and within the course and scope of their employment.

17. For the purpose of Plaintiff's state law claims, but not for claims under section 1983, the City is responsible for the wrongful acts or omissions of its employees under the doctrine if *respondeat superior*.

18. Jeri Williams, Joseph Gage, Darrell Magee, and Francisco Barrios are hereinafter referred to as the "PPD Defendants."

///

## **GENERAL ALLEGATIONS**

### The Lights for Liberty Candlelight Vigil

19. On July 12, 2019, human rights advocates organized national actions to protest the family separations occurring on the United States' southern border.

20. Billed as the "Lights for Liberty: A Vigil to End Human Concentration Camps," the events were planned in over 600 cities and towns throughout the country.[1]

21. That night approximately 1,000 Arizonans gathered at the United Methodist Church on Central Avenue in downtown Phoenix to participate in Maricopa County's Lights for Liberty Events. Jamaar Williams was one of those participants.

22. Although he is a deputy Maricopa County Public Defender by trade, Mr. Williams' efforts at systemic reform are not limited to the courtroom: He is a local leader of the National Lawyers Guild's Central Arizona chapter who has trained countless "Legal Observers" and hosted "Know Your Rights" trainings; has provided regular legal education and guidance to movement groups throughout Arizona; and most substantially, he is one of the most visible leaders of Phoenix's local Black Lives Matter chapter.

23. On the night of July 12, 2019, Mr. Williams and his partner, Phoenix civil rights attorney Heather Hamel, made plans to attend the Vigil as "Legal Observers." While there should be no need for a "Legal Observer" at a candlelit vigil, Mr. Williams and Ms. Hamel had significant prior experience with the Phoenix Police Department's violent responses to First Amendment Assemblies – enough to know that there is always a need for Legal Observers to remind officers that they were being watched and recorded and, in doing so, hopefully keep participants as safe as possible from state violence.

---

[1] "The Anti-Trump Lights for Liberty Events might be the most significant protests you've never heard of." July 31, 2019, Washington Post. Available at: https://www.washingtonpost.com/politics/2019/07/31/anti-trump-lights-liberty-events-might-be-most-significant-protests-you-never-heard/

- 5 -

The Vigil, March and Excessive Use of Force

24. The Lights for Liberty event began with speakers inside the United Methodist Church.

25. After several hours, after the sun had set, the group of approximately 1,000 people began a march up Central Avenue while holding tea candles.

26. The group walked some distance up Central Avenue before turning around and marching south, back to the church.

27. As the group approached the church, the were met with multiple "skirmish lines" of Phoenix police officers in riot gear.

28. Upon seeing this show of force, the group it splintered into two: a small group of approximately 15 protestors sat on the light rail tracks and locked arms, while almost everyone else (Mr. Williams and Ms. Hamel included) continued to protest away from the light rail tracks, eventually moving to the east sidewalk abutting Central Avenue.

29. With the group of protestors occupying the light rail tracks, Mr. Williams shuttled back and forth between a water cooler near the Church and the group – bringing water to the non-violent protestors to protect them against dehydration on a brutally hot July night.

30. On one of these water runs, the Phoenix Police line encircled the protestors on the light rail tracks to effectuate an arrest. Mr. Williams placed his hands in the air to demonstrate his compliance, and an officer instructed him to return to the sidewalk. He immediately complied.

31. As the arrests occurred, Mr. Williams and Ms. Hamel attempted to carry out their roles as Legal Observers – filming the arrests from the east sidewalk, to ensure that no excessive force was used.

32. When Phoenix PD completed the arrests of the light rail protestors, a second group of officers began forcing the remaining Vigil participants further onto the sidewalk.

33. The officers shouted to the group to "back up" and "get on the sidewalk," and continued to repeat this instruction even as the last of the protestors were visibly on the sidewalk.

34. Then, without warning, a line of Phoenix police officers in riot gear began violently pushing Vigil participants.

35. Ms. Hamel was among the Vigil participants assaulted by Phoenix Police, as she was violently shoved by Phoenix Police Officer Darrell Magee and went flying backwards to the ground, suffering a laceration to her leg.

36. When Ms. Hamel stood up, she and Mr. Williams engaged with Officer Magee about his excessive use of force, asking for his name and badge number and threatening to file a lawsuit against him.

37. During this time, the couple also engaged with Sergeant Gage, filming him and asking for his name and badge number as well.

38. The couple continued to peacefully film Officer Magee and Sergeant Gage for approximately seven minutes.

<u>Targeting and Unconstitutional Arrest of Mr. Williams</u>

39. Soon thereafter tensions faded, and the night began coming to a close.

40. Vigil participants, including Mr. Williams and Ms. Hamel, began to leave the area.

41. As they were leaving, however, Mr. Williams heard screaming. He turned around to see a Phoenix police officer erratically waving a pepper ball gun at peaceful protestors.

42. Consistent with his Legal Observer training, Mr. Williams raced back to the front of the protestors, announced his presence, and pulled out his phone to attempt to demonstrate to police that he was filming what was happening in hopes of it disrupting the threatened use of force.

43. As Mr. Williams lifted his phone up, he was grabbed by a group of Phoenix Police officers including Francisco Barrios, thrown to the ground, and handcuffed.

44. After he was arrested, Mr. Williams was transported to the PPD Headquarters in downtown Phoenix for several hours, then to another precinct, and finally to the Maricopa County Fourth Avenue Jail –where Phoenix Police Sergeant Joseph Gage, Officer Magee, and Officer Barrios caused him to be booked for multiple crimes, including two counts of aggravated assault

on Sergeant Gage and Officer Magee (both of which were classified as Class 5 felonies under Arizona law).

45. Mr. Williams spent the night of July 12, 2019 in the Maricopa County Jail, and was detained in jail until a Maricopa County Superior Court commissioner released him on his own recognizance the next day.

<u>Elevation of Mr. Williams' Arrest to City Council</u>

46. When word about Mr. Williams' arrest spread throughout the community, organizers and activists were incredulous.

47. Known for his thoughtful advocacy on behalf of the movement, Mr. Williams was held in high regard for his cool head and sober legal analysis; it was inconceivable that he would risk his career and reputation by assaulting multiple police officers.

48. Shortly after his arrest, skeptical community representatives immediately began pressuring City Council to inquire into the basis for these charges.

49. Upon information and belief, City Council directed these questions to the Phoenix Police Department, which elevated this matter to its own chief executive, Chief of Police Jeri Williams.

50. Upon information and belief, Chief of Police Jeri Williams personally reviewed the evidence that the officers claimed supported the charges against Mr. Williams.

51. Upon information and belief, during this review, Chief of Police Jeri Williams realized that there was no video (or other) evidence showing Mr. Williams assaulting an officer.

52. Upon information and belief, within days of the arrest, Chief of Police Williams caused one of her representatives to meet with the City Council and Mayor Kate Gallego and misrepresented the facts of the case and advised them that the "video evidence" supported the charges that Jamaar Williams had assaulted Sergeant Gage and Officer Magee and that the City would be moving forward with the prosecution.

### Prosecutors "Turn Down" Aggravated Assault Charges

53. Upon information and belief, the Maricopa County Attorney's Office ("MCAO") reviewed all of the evidence that the Phoenix Police Department provided to it regarding Mr. Williams' alleged assaults of Sergeant Gage and Officer Magee.

54. After reviewing this evidence, the MCAO, through its deputy county attorney Jeremy Miller, concluded that the evidence was insufficient to sustain the charges against Mr. Williams and elected not to proceed with those charges.

55. Upon information and belief, Mr. Miller continued to work with Phoenix Police Officers – including but not limited to Officer Barrios, Sergeant Gage, Officer Magee, and others – to determine if other criminal charges could be sustained against Mr. Williams.

56. On or about July 16, 2019, at the urging of PPD, Mr. Miller caused to be filed against Mr. Williams a Direct Complaint formally charging Mr. Williams with resisting arrest, a Class 6 felony under Arizona law, as well as two misdemeanor counts (obstructing a public thoroughfare and participating in an unlawful assembly).

57. Mr. Miller relied on the same factual basis to support the charges of resisting arrest that the officers had used to support the aggravated assault charges:  Both were based exclusively on the false claim that Mr. Williams had "hammer-fist" punched one officer and charged at another to escape arrest.

### Defense of Mr. Williams and Dismissal of Charges

58. Over the next five weeks, Mr. Williams' counsel made numerous requests of MCAO and the City of Phoenix for evidence – in particular, the video that PPD claimed captured the alleged assaults.

59. Neither Mr. Miller nor the City of Phoenix provided Mr. Williams or his counsel with video or any other evidence of his alleged guilt.

60. Recognizing that it would be incumbent upon him to establish his own innocence, Mr. Williams and his legal team collected hours of video footage accounting for Mr. Williams

behavior the entire night. They also collected declarations from witnesses, letters from the Church who hosted the vigil, and other evidence demonstrating that he had not broken any laws.

61. Mr. Williams and his legal team disclosed all of this evidence to Mr. Miller.

62. On August 22, 2019, Mr. Miller presented the State's case to Maricopa County Superior Court Commissioner David Seyer.

63. The State's case was premised entirely on the testimony of Officer Barrios.

64. In his sworn testimony, Officer Barrios admitted that the protest was peaceful—that participants were not violent, threatening violence, or rioting.

65. Officer Barrios also admitted that he did not make any personal observations of Mr. Williams resisting arrest; that Mr. Williams was respectful to him and did <u>not</u> resist his arrest; and that the sum of his knowledge of Mr. Williams' allegedly unlawful conduct came was based on the statements of Sergeant Gage and Officer Magee.

66. Officer Barrios testified that his only knowledge of Mr. Williams' allegedly illegal conduct had been provided to him, second-hand, by other officers.

67. On cross-examination, Officer Barrios dropped a bombshell: He admitted, under oath, that he was specifically advised that these claims against Mr. Williams were untrue.

68. Officer Barrios testified that, on the day after the arrest (July 13, 2019), Phoenix police officers concluded that there was *no video evidence* showing Mr. Williams assaulting an officer.

69. Officer Barrios further testified that he had been informed by Phoenix police officers that Mr. Williams had simply been misidentified, and that they had "made a mistake" in arresting him for assault.

70. After hearing the sum of this evidence, Commissioner Seyer found all charges against Mr. Williams to be unsupported by probable cause and dismissed the prosecution against him.

71. Upon information and belief, none of the officers involved in these wrongful efforts to prosecute Mr. Williams have ever been investigated or disciplined.

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Unlawful Arrest and Imprisonment in Violation of the Fourth Amendment to the United States Constitution**
**(Against Defendants Gage, Magee, and Barrios Only)**

72. Plaintiff hereby incorporates by reference the allegations contained in the foregoing paragraphs as if they were fully set forth herein.

73. 42 U.S.C section 1983 provides, in relevant part, as follows:

> Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory of the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

42 U.S.C. § 1983.

74. Plaintiff Jamaar Williams is a citizen of the United States.

75. Defendants Gage, Magee, and Barrios are "persons" as that term is defined by 42 U.S.C. § 1983.

76. Defendants Gage, Magee, and Barrios were, at all times relevant hereto, acting under the color of law in their capacities as City of Phoenix police officers; their acts and omissions were conducted within the scope of their official duties or employment.

77. At the time of the complained-of events, the Fourth Amendment to the United States Constitution clearly established Plaintiff's right to be secure in his person from unreasonable seizure through an arrest unsupported by probable cause (an "unlawful arrest").

78. At the time of the complained-of events, any reasonable police officer would have known that the Constitution clearly establishes the right of American citizens to be secure in their persons from unreasonable seizure through an unlawful arrest.

79. At the time they caused Mr. Williams to be arrested, objectively reasonable police officers in the position of Defendants Gage, Magee, and Barrios would have concluded that there was <u>not</u> a fair probability that Mr. Williams had committed or was committing a crime.

80. The actions of Defendants Gage, Magee, and Barrios, as described herein, were malicious and/or involved reckless, callous, and deliberate indifference to Plaintiff's federally protected rights.

81. The actions of Defendants Gage, Magee, and Barrios were moving forces behind Plaintiff's injuries, intentionally depriving him of his constitutional rights and causing her other damages.

82. Defendants Gage, Magee, and Barrios are not entitled to qualified immunity for the conduct complained of in this Complaint.

83. As a proximate result of these Defendants' unlawful and unconstitutional conduct, Plaintiff suffered injuries and other damages and losses as described herein entitling Plaintiff to compensatory, economic, consequential and special damages in an amount to be determine at trial.

84. Plaintiff is further entitled to his attorneys' fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

85. Finally, in addition to compensatory, economic, consequential and special damages, Plaintiff is entitled to punitive damages against Defendants under 42 U.S.C. § 1983, in that the actions of these Defendants were taken maliciously, willfully, or with a reckless disregard of Plaintiff's constitutional rights.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Malicious Prosecution in Violation of Fourth Amendment to the United States Constitution**
**(Against Defendants Williams, Gage, Magee, and Barrios Only)**

86. Plaintiff hereby incorporates by reference the allegations contained in the foregoing paragraphs as if they were fully set forth herein.

87.     42 U.S.C section 1983 provides, in relevant part, as follows:

> Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory of the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress…

42 U.S.C. § 1983.

88.     Plaintiff is a citizen of the United States.

89.     Defendants Williams, Gage, Magee, and Barrios are "persons" as that term is defined by 42 U.S.C. § 1983.

90.     Defendants Williams, Gage, Magee, and Barrios were, at all times relevant hereto, acting under the color of law in their capacities as City of Phoenix police officers; their acts and omissions were conducted within the scope of their official duties or employment.

91.     At the time of the complained-of events, the Fourth Amendment to the United States Constitution clearly established Mr. Williams' right to be free from criminal prosecution without probable cause.

92.     At the time of the complained-of events, any reasonable police officer in Defendants' position would have known that the Constitution clearly establishes the right of American citizens to be free from criminal prosecution without probable cause.

93.     Defendants Williams, Gage, Magee, and Barrios violated these rights when he instituted, procured, and/or continued a criminal proceeding against Mr. Williams, as Mr. Williams had not committed any criminal offenses.

94.     Specifically, as described above, Defendants Gage and Magee lied and falsely claimed that Mr. Williams' assaulted them and resisted arrest; Defendant Barrios facilitated these misrepresentations and relayed them to the Maricopa County Attorney's Office; and Chief Williams reviewed the evidence and permitted the prosecution to proceed despite having actual knowledge that Mr. Williams had not committed any criminal acts.

95.     Further, upon information and belief, Defendants Williams, Gage, Magee, and Barrios pressured the Maricopa County Attorney's Office to find some criminal charge to levy against Mr. Williams, irrespective of its lack of legal basis, to attempt to (a) insulate themselves from civil suit or administrative complaint arising out of their wrongful arrest and imprisonment of Mr. Williams, (b) attempt to damage the career and reputation of a vocal political opponent of the Phoenix Police Department, or (c) both.

96.     Defendants, each and all of them, engaged in the above-described conduct willfully, maliciously, in bad faith, and in reckless disregard of Mr. Williams' federally protected constitutional rights.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Municipal Liability under *Monell***
**(Against Defendant City of Phoenix Only)**

97.     Plaintiff hereby incorporates by reference the allegations contained in the foregoing paragraphs as if they were fully set forth herein.

98.     Municipal bodies are liable for constitutional violations under 42 U.S.C. § 1983 when execution of its official policy or custom deprives an individual of its rights protected by the Constitution.

99.     Such municipal liability exists when a city fails to properly train, supervise, or discipline its employees, amounting to a deliberate indifference to a plaintiff's constitutional rights.

100.    Upon information and belief, the Phoenix Police Department engages in a host of efforts to attempt to monitor and ultimately suppress dissent, including but not limited to the following:  (1) maintaining files on prominent activists and community organizers who are critical of police generally or PPD; (2) maintaining a practice of illegally and improperly declaring lawful First Amendment Assemblies "unlawful" for the purpose of breaking them up; and (3) targeting prominent activists and critics of PPD for arrest.

101.    Upon information and belief, despite the highest levels of PPD being involved in the decision to prosecute Mr. Williams for crimes he did not commit, the City of Phoenix has failed

1 to investigate or discipline any of the individuals involved in the wrongful arrest, serving as a legal ratification of the officers' misconduct.

102. The sum of this unconstitutional behavior has been carried out pursuant to policies, patterns, practices, and/or customs, whether formal or informal, which violate the constitutional rights of the Mr. Williams and others in his situation.

103. The condoning of the misconduct, and failure to end these policies, patterns, practices, or customs, was a direct and proximate cause of injuries suffered by Mr. Williams.

**FOURTH CLAIM FOR RELIEF**
**Malicious Prosecution under Arizona law**
**(Against Defendants Williams, Gage, Magee, Barrios & City of Phoenix)**

104. Plaintiff hereby incorporates by reference the allegations contained in the foregoing paragraphs as if they were fully set forth herein.

105. As set forth above, Defendants Williams, Gage, Magee, Barrios initiated and/or took active part in the criminal prosecution against Mr. Williams.

106. As set forth herein, the criminal prosecution against Mr. Williams was terminated in her favor when the Court dismissed all charges against him.

107. As set forth herein, Defendants Williams, Gage, Magee, and Barrios acted with malice, causing Mr. Williams to be charged with two counts of resisting arrest, one count of obstructing a public thoroughfare, and one count of unlawful assembly to (a) insulate themselves from civil suit or administrative complaint arising out of their wrongful arrest and imprisonment of Mr. Williams, (b) attempt to damage the career and reputation of a vocal political opponent, or (c) both.

108. As a direct and proximate result of these Defendants' malicious conduct, Mr. Williams was injured and suffered damages in an amount to be proven at trial.

**FIFTH CLAIM FOR RELIEF**
**Invasion of Privacy – False Light under Arizona law**
**(Against Defendant City of Phoenix Only)**

109. Plaintiff hereby incorporates by reference the allegations contained in the foregoing paragraphs as if they were fully set forth herein.

110. As set forth above, employees of Defendant City of Phoenix, acting in the course and scope of their employment, made false and misleading public statements against Mr. Williams – namely, that he had assaulted police officers at the Lights for Liberty vigil.

111. The City's statements created a false impression about Mr. Williams, a respected attorney and community leader – namely that he had engaged in violence and committed aggravated assaults against two uniformed police officers.

112. The impression created about Mr. Williams – that he had engaged in physical assaults of multiple uniformed police officers – would be highly offensive to any reasonable person who had dedicated his career and life to peacefully working for reform.

113. The false and misleading statements caused Mr. Williams to be damaged and negatively impacted his community standing, professional reputation, emotional well-being, and mental health.

114. At the time the false statement was made, the City's employees either knew the statement would create a false impression of Mr. Williams or acted in reckless disregard of the fact that their statement would create a false impression of Mr. Williams.

**SIXTH CLAIM FOR RELIEF**
**Intentional Infliction of Emotional Distress**
**(Against Defendant City of Phoenix Only)**

115. Plaintiff hereby incorporates by reference the allegations contained in the foregoing paragraphs as if they were fully set forth herein.

116. As set forth above, employees of Defendant City of Phoenix, acting in the course and scope of their employment, engaged in a series of acts that an average member of the community would regard as atrocious, intolerable in a civilized community, and beyond all possible

bounds of decency.

117. The aforementioned conduct was intentional insofar as it intended to cause Mr. Williams emotional distress.

118. The aforementioned conduct was reckless because those engaging in it were aware of and consciously disregarded the near certainty that it would cause Mr. Williams emotional distress.

119. The aforementioned conduct did, indeed, cause Mr. Williams to suffer emotional distress.

120. As a direct and proximate result of these actions, Mr. Williams was injured and suffered damages in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Jamaar Williams requests that the Court enter judgment against Defendants as follows:

   a. For damages in an amount to compensate Plaintiff fully and fairly for the violations of his Constitutional Rights;

   b. For general, consequential, special, and compensatory damages, including but not limited to his pain and suffering, mental anguish, emotional suffering, and loss of enjoyment of life;

   c. For nominal damages as provided for by law;

   d. For punitive damages in an amount sufficient to punish defendants and deter them from similar unconstitutional and unlawful conduct in the future;

   e. For prejudgment interest on all liquidated sums;

   f. For attorneys' fees under 42 U.S.C. §§ 1983 and 1988;

   g. For Plaintiff's costs and other expenses incurred in this action; and

   h. Such other and further relief as the Court deems just.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38, Fed. R. Civ. P., Plaintiff Jamaar Williams hereby demands that this matter be tried to a jury.

DATED this 10th day of July, 2020.

                THE PEOPLE'S LAW FIRM
                645 North 4th Avenue, Suite A
                Phoenix, Arizona 85003

                By: /s/ Stephen D. Benedetto
                      Stephen D. Benedetto

                *Attorneys for Plaintiff Jamaar Williams*