THE PEOPLE'S LAW FIRM, PLC
Stephen D. Benedetto (Ariz. Bar No. 022349)
645 North 4th Avenue, Suite A
Phoenix, Arizona 85003
Telephone: (602) 456-1901
Facsimile: (602) 801-2834
benedetto@the-plf.com

*Attorneys for Plaintiff Jamaar Williams*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jamaar Williams,<br><br>          Plaintiff,<br><br>   v.<br><br>City of Phoenix, a municipal corporation,<br><br>Jeri Williams, Chief of Police of the Phoenix Police Department, in her individual capacity,<br><br>Joseph Gage, a City of Phoenix Police Officer, in his individual capacity,<br><br>Darrell Magee, a City of Phoenix Police Officer, in his individual capacity,<br><br>Francisco Barrios, a City of Phoenix Police Officer, in his individual capacity,<br><br>          Defendants. | Case No. 2:20-CV-01367-PHX-SMB (MHB)<br><br>**FIRST AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)** |

For his Amended Complaint against Defendants City of Phoenix, Jeri Williams, Joseph Gage, and Darrell Magee, Plaintiff Jamaar Williams, through undersigned counsel, hereby alleges as follows:

**PARTIES**

1.       Plaintiff Jamaar Williams is an unmarried man residing in Maricopa County, Arizona.

2.       Defendant Jeri Williams is the Chief of Police of the Phoenix Police Department, working and residing in Maricopa County, Arizona.

3.       Upon information and belief, Defendant Joseph Gage is a sworn police officer for the City of Phoenix, working and residing in Maricopa County, Arizona.

4.       Upon information and belief, Defendant Darrell Magee is a sworn police officer for the City of Phoenix, working and residing in Maricopa County, Arizona.

5.       Upon information and belief, Defendant Francisco Barrios is a sworn police officer for the City of Phoenix, working and residing in Maricopa County, Arizona.

6.       Defendant City of Phoenix (the "City") is municipal corporation created under the laws of the State of Arizona.  The City maintains and operates a law enforcement agency known as the City of Phoenix Police Department ("PPD").

7.       The City is under a duty to run its law enforcement activities in a lawful manner so as to preserve the peace and to preserve for its citizens the rights, privileges, and immunities guaranteed and secured to them by the Constitutions and laws of the United States and the State of Arizona.

8.       The City has established and implemented, or delegated to PPD the responsibility for establishing and implementing, policies, practices, procedures and/or customs used by law enforcement officers employed by the City regarding the investigation, detention, arrest, and use of force during law enforcement operations.

9.       Every act and omission of the employees, representatives, and agents of Defendants detailed in this Complaint was performed under the color and pretense of the Constitutions, statutes, ordinances, regulations, customs and uses of the United States of

America, the State of Arizona, and the City of Phoenix, by virtue of their authority as sworn officers, and within the course and scope of their employment.

10. For the purpose of Plaintiff's state law claims, but not for claims under section 1983, the City is responsible for the wrongful acts or omissions of its employees under the doctrine if *respondeat superior*.

11. Jeri Williams, Joseph Gage, Darrell Magee, and Francisco Barrios are hereinafter referred to as the "PPD Defendants."

## JURISDICTION AND VENUE

12. Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343(a)(3)(4) and 1367(a). This Court has jurisdiction over Plaintiff's claims for violation of Plaintiff's civil rights under 42 U.S.C. § 1983, and pendent jurisdiction over his state law claims pursuant to 28 U.S.C. § 1367(a).

13. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 in that the acts and omissions that give rise to this action occurred within this District and this Court otherwise has jurisdiction.

14. This case presents an actual case in controversy arising under the Fourth Amendment to the United States Constitution, and under the provisions of 42 U.S.C. §§ 1983 and 1988.

## GENERAL ALLEGATIONS

### The Lights for Liberty Protest

16. On July 12, 2019, human rights advocates organized national actions to protest the family separations occurring on the United States' southern border.

/ / /

- 3 -

17.    Billed as the "Lights for Liberty:  A Vigil to End Human Concentration Camps," the events were planned in over 600 cities and towns throughout the country.  The event was specifically conceived as a protest against then-President Donald Trump.[1]

18.    That night approximately 1,000 Arizonans gathered at the United Methodist Church on Central Avenue in downtown Phoenix to protest against President Trump participate in Maricopa County's Lights for Liberty events.  Jamaar Williams was one of those participants.

19.    Although Mr. Williams is a deputy Maricopa County Public Defender by trade, Mr. Williams' efforts at systemic reform are not limited to the courtroom:  He is a local leader of the National Lawyers Guild's Central Arizona chapter who has trained "Legal Observers" and hosted "Know Your Rights" trainings; has provided regular legal counsel and guidance to movement groups throughout Arizona; and co-founded Phoenix's local Black Lives Matter chapter.

20.    On the night of July 12, 2019, Mr. Williams and his partner, Phoenix civil rights attorney Heather Hamel, made plans to attend the Vigil as "Legal Observers."

21.    While there should be no need for a "Legal Observer" at a candlelight vigil, Mr. Williams and Ms. Hamel had significant prior experience with the Phoenix Police Department's violent responses to First Amendment Assemblies.

22.    Mr. Williams' knowledge of PPD violence against left-leaning (or perceived left-leaning) protestors, including but not limited to the following:  Phoenix Police Officers shooting pepper bullets at non-violent protest in October 2014; Phoenix PD shooting tear gas and pepper spray into a crowd of Black Lives Matter protestors in July 2016; and

---

[1] "The Anti-Trump Lights for Liberty Events might be the most significant protests you've never heard of."  July 31, 2019, Washington Post.  Available at: https://www.washingtonpost.com/politics/2019/07/31/anti-trump-lights-liberty-events-might-be-most-significant-protests-you-never-heard/

Phoenix PD shooting tear-gas, pepper spray, and kinetic weapons into a crowd of protestors at an anti-Trump protest on August 22, 2017.

23.    Based on his experience, Mr. Williams reasonably believed that it would be necessary to have Legal Observers present to remind officers that they were being watched and recorded and, in doing so, hopefully keep participants as safe as possible from state violence.

The Vigil, March and Illegal Unlawful Assembly Orders

24.    The Lights for Liberty event began with speakers inside the United Methodist Church.

25.    After several hours, after the sun had set, the group of approximately 1,000 people began a march north, on the sidewalk on the east side of Central Avenue, while holding tea candles.

26.    As attendees marched on the east sidewalk, traffic passed by them in Central Avenue's northbound lanes.[2]

27.    The group walked some distance along Central Avenue before turning around and marching south, back to the church.

28.    As the group moved south, back towards the church, Phoenix Police set up a vehicle blockade of the roadway—preventing traffic from entering Central Avenue

29.    As the group approached the church, they were met by multiple "skirmish lines" of Phoenix police officers in riot gear.

30.    Upon seeing the show of force, the group it splintered into two:  a small group of approximately 15 protestors sat on the light rail tracks and locked arms in an act of non-violent civil disobedience, while almost everyone else (Mr. Williams and Ms. Hamel included) moved to the east sidewalk abutting Central Avenue.

---

[2] *See* https://www.youtube.com/watch?v=kgVcvUeyHzk at 0:49-0:53.

31. At no point did any of the vigil attendees (including without limitation Mr. Williams and Ms. Hamel) recklessly use force or violence, or threaten to use force or violence accompanied by immediate power of execution.

32. Despite the lack of any evidence of a "riot," Phoenix PD began repeating rote "dispersal orders" on the loud-speaker–generically ordering everyone in the area to leave and return home in clear violation of the attendees' First Amendment rights.

33. With the group of protestors occupying the light rail tracks, Mr. Williams shuttled back and forth between a water cooler near the Church and the group—bringing water to the non-violent protestors to protect them against dehydration on a brutally hot July night.

34. On one of these water runs, the Phoenix Police line encircled the protestors on the light rail tracks and instructed Mr. Williams to return to the sidewalk. He immediately complied.

35. As the arrests occurred, Mr. Williams and Ms. Hamel attempted to carry out their roles as Legal Observers—attempting to observe the arrests and ensure that no excessive force was used while remaining on or near the east sidewalk.

36. When Phoenix PD completed the arrests of the light rail protestors, a second group of officers began forcing the remaining Vigil participants further onto the sidewalk.

37. The officers shouted to the group to "back up" and "get on the sidewalk," and continued to repeat this instruction even as the last of the protestors were visibly on the sidewalk.

38. As depicted in the image below, Mr. Williams and Ms. Hamel stood on the sidewalk, out of the roadway, peacefully and non-violently filming the PPD officers on the skirmish line.



**Figure 1:  Vigil attendees on sidewalk, Mr. Williams (circled) filming**

39.     Then, without warning, a line of Phoenix police officers in riot gear began violently pushing Vigil participants.

40.     As captured by police video, Mr. Williams and Ms. Hamel were among the Vigil participants assaulted by Phoenix Police:  Mr. Williams was shoved in the chest by Sergeant Gage, while Ms. Hamel was violently shoved by Officer Magee—causing her to leave her feet and fall to the ground, ultimately suffering a laceration to her leg.

41.     Mr. Williams and Ms. Hamel then stood up and began to engage with Sergeant Gage and Officer Magee—firmly and non-violently–about the excessive force they had just wielded against them.

42.     After pointing to the ground to demonstrate that they had been standing on the sidewalk when they were assaulted, Mr. Williams pulled out his camera and demanded Officer Magee's badge number so that he and Ms. Hamel could exercise their rights to hold Officer Magee accountable—including, specifically, threatening to file a lawsuit against him.

43.    During the entire interaction that followed the assault on Ms. Hamel, Mr. Williams stood within feet of Officer Magee and the entire skirmish line of officers for a lengthy period of time—filming them and verbally engaging with them in an entirely non-violent manner.  [see below image]



**Figure 2:  Mr. Williams, after he and Ms. Hamel were assaulted, filming**

44.    Mr. Williams argued with the officers for over two minutes, standing directly in front of them as he continued to explain that they had been standing on the sidewalk when they were shoved and the use of force was excessive.

45.    As tensions eased, Mr. Williams pulled out a bottle of water and drank it while officers stood around him.

46.    No officers made any effort to contact him, grab him, or arrest him at any time during this interaction.

47.    Vigil participants, including Mr. Williams and Ms. Hamel, began to leave the area.  At no point before then did any Phoenix police officers—including Officer Magee or

Sergeant Gage—attempt to grab Mr. Williams, inform him that he was under arrest, or otherwise make any effort to take him into custody.

48.     At one point officer stood and watched Mr. Williams calmly drink a bottle of water—again, making no effort to grab him, inform him that he was under arrest, or otherwise make any effort to take him into custody.



**Figure 3:  Mr. Williams, drinking water as police watch**

Targeting and Unconstitutional Arrest of Mr. Williams

49.     As Mr. Williams and Ms. Hamel were leaving the event, Mr. Williams heard screaming in the crowd.  He turned around to see a Phoenix police officer erratically waving a pepper ball gun at peaceful protestors.

50.     Consistent with his Legal Observer training, Mr. Williams returned to the remaining group, announced his presence, and pulled out his phone to attempt to demonstrate to police that he was filming what was happening in hopes of it disrupting the threatened use of force.

51.    As Mr. Williams lifted his phone up, he was grabbed by a group of Phoenix Police officers—including Francisco Barrios—without warning or notice.

52.    Mr. Williams allowed himself to be pulled behind the skirmish line by Officer Barrios, where he was thrown down to the pavement.  Multiple officers, including (upon information and belief) Officer Barrios, then piled on top of him and handcuffed him.

53.    As he laid on the pavement, under multiple officers, Mr. Williams gave up his hands to allow himself to be arrested.

54.    After his arrest, Mr. Williams was transported to the Fourth Avenue Jail where Phoenix Police Sergeant Joseph Gage, Officer Magee, Officer Barrios, and Sergeant McBride caused him to be booked for multiple crimes, including two counts of aggravated assault on Sergeant Gage and Officer Magee (both of which were classified as Class 5 felonies under Arizona law).

55.    Prior to booking Mr. Williams into the Maricopa County Jail, Gage, Magee, and Barrios were each and all aware that Mr. Williams was a criminal defense attorney and community leader.

56.    Mr. Williams spent the night of July 12, 2019 in the Maricopa County Jail, and was detained in jail until a Maricopa County Superior Court commissioner released him on his own recognizance the next day.

<u>Elevation of Mr. Williams' Arrest to City Council</u>

57.    When word about Mr. Williams' arrest spread throughout the community, organizers and activists were incredulous.

58.    Known as the "lawyer to the movement," Mr. Williams was held in high-regard for his cool head and sober legal analysis.  He was also not only a trained legal observer, but had *trained* other legal observers for the National Lawyers Guild.  It seemed inconceivable that he would risk his career and reputation by resisting arrest, much less assaulting multiple police officers.

59.    Shortly after his arrest, community representatives immediately began pressuring the Phoenix City Council to inquire into the basis for these charges.

60.    Upon information and belief, City Council directed these questions to the Phoenix Police Department, which elevated this matter to its own chief executive and policymaker, Chief Jeri Williams.

61.    Upon information and belief, Chief of Police Jeri Williams personally reviewed the evidence that the officers claimed supported the charges against Mr. Williams.

62.    Upon information and belief, within days of the arrest, Chief Williams caused one of her representatives to meet with the City Council and Mayor Kate Gallego and advise Council that the "video evidence" supported the charges that Jamaar Williams had assaulted Officer Magee and Sergeant Gage and that the City would be moving forward with the charges.

Prosecutor Charge Mr. Williams with Resisting Arrest

63.    Upon information and belief, Defendants Williams, Barrios, Gage, and Magee (the "PPD Defendants") submitted to the Maricopa County Attorney's Office ("MCAO") reviewed a packet of "evidence" in support of its allegations that Mr. Williams' had assaulted Defendants Gage and Magee, committed unlawful assembly, and obstructed a thoroughfare.

64.    Upon information and belief, this submittal included Officer Barrios' Incident Report and Officer Magee's supplemental report.

65.    Upon information and belief, based on this information, DCA Miller refused to charge Mr. Williams with aggravated assault.

66.    To further their efforts to protect themselves from a potential civil suit by Mr. Williams, and the support the Chief's false representations of fact to City Council, the PPD Defendants continued to pressure DCA Miller into charging Mr. Williams with some felony.

67.    On or about July 16, 2019, based on the *false information* provided to him by the PPD Defendants, DCA Miller caused to be filed against Mr. Williams a Direct Complaint formally charging Mr. Williams with three counts: Count One: Resisting Arrest, a Class 6 felony; Count Two: Unlawful Assembly, a Class 1 misdemeanor; and Count Three: Obstructing a Highway or Other Public Thoroughfare, a Class 3 misdemeanor.

68.    DCA Miller then caused Mr. Williams to be presented with a plea agreement under which Mr. Williams would be required to plead guilty to resisting arrest in exchange for designation of that offense as a misdemeanor.

<u>Defense of Mr. Williams and Dismissal of Charges</u>

69.    Over the next five weeks, Mr. Williams' counsel made numerous requests of MCAO and the City of Phoenix for evidence—in particular, the video that Chief Williams had claimed to City Council captured the alleged assaults or resisting arrest.

70.    Neither MCAO nor the City of Phoenix provided Mr. Williams or his counsel with any video—or any other evidence of his alleged guilt.

71.    Recognizing that it would be incumbent upon him to establish his own innocence, Mr. Williams and his legal team collected video, written statements, and other evidence from vigil attendees demonstrating his innocence.

72.    Mr. Williams produced this video to the prosecutor's office, proving that he did <u>not</u> resist arrest or engage in any other criminal act.

73.    On August 22, 2019, DCA Miller presented the State's case to Maricopa County Superior Court Commissioner David Seyer.

74.    The State's case was premised entirely on the testimony of Officer Barrios.

75.    In his sworn testimony, Officer Barrios admitted under oath that he did not make any personal observations of Mr. Williams resisting anyone's arrest.

76.    Officer Barrios admitted under oath that Mr. Williams was respectful to him and did <u>not</u> resist his arrest.

77.    Officer Barrios admitted under oath that the sum of his knowledge of Mr. Williams' allegedly unlawful conduct came was based on the statements of Sergeant Gage and Officer Magee.

78.    Officer Barrios admitted under oath that had been told that his only knowledge of Mr. Williams' allegedly illegal conduct had been provided to him, second-hand, by other officers.

79.    On cross-examination Officer Barrios admitted under oath that, the day after the arrest (July 13, 2019), he was specifically advised that the allegations against Mr. Williams were untrue:  Specifically, that he advised that Mr. Williams had been misidentified and the officers "made a mistake" in arresting him for assault.

80.    In other words, Officer Barrios knew at all times prior to the hearing—including the submission of his Incident Report to MCAO—that the information contained in his report was false.

81.    The State and Officer Barrios also specifically presented evidence to the Court that Mr. Williams was in the roadway and had refused to leave the protest after Phoenix Police gave announcements to leave.

82.    After hearing all of this evidence, Commissioner Seyer concluded that there was no probable cause to conclude that Mr. Williams had committed resisting arrest, unlawful assembly, or obstructing a thoroughfare.

83.    Based on the lack of probable cause, Commissioner Seyer dismissed all charges against Mr. Williams.

Subsequent Investigation and Revealing of PPD Factual Misrepresentations

84.    After Commissioner Seyer's dismissal of the charges, PPD assigned a member of its violent crimes unit to reinvestigate the evidence against Mr. Williams in an attempt to bolster the case for criminal charges against him.

85. During the reinvestigation, Officer Barrios denied having any personal knowledge of what had happened with Mr. Williams' interaction with Officer Magee and Sergeant Gage.

86. During the reinvestigation, PPD Sergeant Douglas McBride claimed that Sergeant Gage was assaulted, and had his arrest resisted, by a 6'0, 350-pound Hispanic man—not by Mr. Williams.

87. During the reinvestigation, Officer Magee initially repeated his false statements that Mr. Williams had resisted his arrest.

88. Months later, Officer Magee changed his story when he was contacted by Phoenix Police Lieutenant James Hester about his claims, and drafted a supplemental police report to "insure the facts regarding my involvement are clearly documented and corrected."

89. In his new "clarifying" supplemental report, Officer Magee made no claim that Mr. Williams pulled away or otherwise attempted to resist his arrest.

90. During the reinvestigation, Sergeant Gage told the detective that he never attempted to arrest Mr. Williams and that Mr. Williams never assaulted him.

<u>Lack of Internal Investigation or Discipline</u>

91. PPD's video evidence (in its possession since the night of the arrest) and its subsequent re-investigation, proved that Sergeant Gage, Officer Magee, and Officer Barrios had made materially false representations in police reports and to DCA Miller that had resulted in Mr. Williams being prosecuted for multiple criminal offenses.

92. Despite this, none of the officers involved in these wrongful efforts to prosecute Mr. Williams were ever investigated or disciplined for their role in the events.

93. To the contrary, Chief Williams—the City's policymaker—specifically <u>ratified</u> the officers' initial false claims, representing to City Council that she had *reviewed evidence of the events* and that they *supported the felony charges against Mr. Williams.*

94. After his role in coordinating the unlawful prosecution of Mr. Williams, PPD promoted Sergeant McBride to "full-time training sergeant" after he coordinated the effort to cause Mr. Williams to be unlawfully arrested and prosecuted.

95. Upon information and belief, after their reinvestigation revealed these untruths, PPD actually attempted to resubmit the case to MCAO with a request that MCAO charge Mr. Williams with felonies he did not commit.

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Unlawful Arrest and Imprisonment in Violation of the Fourth Amendment to the United States Constitution**
**(Against Defendants Gage, Magee, and Barrios Only)**

96. Plaintiff hereby incorporates by reference the allegations contained in the foregoing paragraphs as if they were fully set forth herein.

97. 42 U.S.C section 1983 provides, in relevant part, as follows:

> Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory of the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

42 U.S.C. § 1983.

98. Plaintiff Jamaar Williams is a citizen of the United States.

99. Defendants Gage, Magee, and Barrios are "persons" as that term is defined by 42 U.S.C. § 1983.

100. Defendants Williams, Gage, Magee, and Barrios were, at all times relevant hereto, acting under the color of law in their capacities as City of Phoenix police officers; their acts and omissions were conducted within the scope of their official duties or employment.

- 15 -

101.    At the time of the complained-of events, the Fourth Amendment to the United States Constitution clearly established Plaintiff's right to be secure in his person from unreasonable seizure through an arrest unsupported by probable cause (an "unlawful arrest").

102.    At the time of the complained-of events, any reasonable police officer would have known that the Constitution clearly establishes the right of American citizens to be secure in their persons from unreasonable seizure through an unlawful arrest.

103.    At the time of the complained-of events, objectively reasonable police officers in the position of Defendants Gage, Magee, and Barrios would have concluded that there was not a fair probability that Mr. Williams had committed or was committing a crime.

104.    Mr. Williams did not assault any police officers.

105.    Mr. Williams did not resist arrest.

106.    Mr. Williams did not assemble with two or more persons with the intent to engage in a riot as defined by A.R.S. § 13-2903.

107.    Mr. Williams was not present at an assembly of persons who were engaged in a riot or had the ready apparent intent to engage in a riot as defined by A.R.S. § 13-2903.

108.    Mr. Williams did not obstruct a highway or other public thoroughfare:  He was *not* among the group obstructing the light rail tracks, and he never created an unreasonable inconvenience or hazard that recklessly interfered with passage of any vehicles on Central Avenue.

109.    Phoenix Police's erection of a blockade south of the vigil prevented traffic from entering the roadway well south of where Mr. Williams was standing.

110.    No reasonable officer could believe that Mr. Williams had committed a criminal offense under Arizona law.

111.    In his Incident Report, Officer Barrios indicates that Sergeant Gage advised him to arrest Mr. Williams.

- 16 -

112. In his Incident Report, Officer Magee indicates that he advised another sergeant that Mr. Williams needed to be arrested.

113. Collectively, Defendants Gage, Magee, and Barrios each and all acted to cause Mr. Williams to be arrested for offense that they knew he had not committed.

114. The actions of Defendants Gage, Magee, and Barrios, as described herein, were malicious and/or involved reckless, callous, and deliberate indifference to Plaintiff's federally protected rights.

115. The actions of Defendants Gage, Magee, and Barrios were moving forces behind Plaintiff's injuries, intentionally depriving him of his constitutional rights and causing her other damages.

116. Defendants Gage, Magee, and Barrios are not entitled to qualified immunity for the conduct complained of in this Complaint.

117. As a proximate result of these Defendants' unlawful and unconstitutional conduct, Plaintiff suffered injuries and other damages and losses as described herein entitling Plaintiff to compensatory, economic, consequential and special damages in an amount to be determine at trial.

118. Plaintiff is further entitled to his attorneys' fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

119. Finally, in addition to compensatory, economic, consequential and special damages, Plaintiff is entitled to punitive damages against Defendants under 42 U.S.C. § 1983, in that the actions of these Defendants were taken maliciously, willfully, or with a reckless disregard of Plaintiff's constitutional rights.

///

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Malicious Prosecution in Violation of Fourth Amendment to the United States Constitution**
**(Against Defendants Williams, Gage, Magee, Barrios, and McBride Only)**

120. Plaintiff hereby incorporates by reference the allegations contained in the foregoing paragraphs as if they were fully set forth herein.

121. At the time of the complained-of events, the Fourth Amendment to the United States Constitution clearly established Mr. Williams' right to be free from criminal prosecution without probable cause.

122. At the time of the complained-of events, any reasonable police officer in Defendants' position would have known that the Constitution clearly establishes the right set forth in the preceding paragraph—which specifically imposes on officers the duty to not knowingly present false information to prosecutors or otherwise pressure them into charging innocent people with crimes they did not commit.

123. The PPD Defendants violated this Constitutional right when they caused to be provided to DCA Miller incident and supplemental police reports representing that (i) Mr. Williams had assaulted both Officer Magee and Sergeant Gage, (ii) both Officer Magee and Sergeant Gage attempted to arrest Mr. Williams; and (iii) Mr. Williams had resisted both of their arrests.

124. Defendants Gage and Magee knew that these allegations were false at the time they made them (i.e., the night they caused Mr. Williams to be arrested).

125. Defendant Barrios knew these allegations were false within one day of Mr. Williams' arrest, when he was advised that Mr. Williams had been "misidentified."

126. Chief Williams knew these claims false when she reviewed the surveillance video, within days of the arrest.

127. Despite this actual knowledge, the PPD Defendants provided this false information to DCA Miller in an attempt to mislead him into charging Mr. Williams.

- 18 -

128. The PPD Defendants further *withheld* from DCA Miller information that they knew was relevant (i.e., the video surveillance of Mr. Williams that evening) which, if provided, would have refuted the officers' claims and undermined their credibility.

129. The PPD Defendants also *withheld* from DCA Miller any actual statement by Sergeant Gage, who refused to draft a supplemental police report for DCA Miller's consideration.

130. The PPD Defendants also *withheld* from DCA Miller the fact that Officer Barrios's Incident Report was based on hearsay: i.e., that Officer Barrios himself had not personally observed <u>any</u> of the events that he alleged supported assault and resisting arrest charges against Mr. Williams.

131. In addition, upon information and belief, the PPD Defendants directly communicated to DCA Miller that the Chief of Police herself was aware of the case, had reviewed the evidence, and supported the charges.

132. As a licensed attorney, DCA Miller has an ethical obligation to "refrain from prosecuting a charge that the prosecutor knows is not supported by probable cause." *See* E.R. 3.8.

133. Upon information and belief, DCA Miller proceeded with these charges on the basis of the <u>false information</u> provided by the PPD Defendants, and the deliberate withholding of evidence that would have revealed that information to be false and misleading.

134. Any reasonable prosecutor provided with PPD's video of Mr. Williams' interaction with Sergeant Gage and Officer Magee would have concluded that there was no probable cause to charge Mr. Williams with resisting arrest.

135. Presented with false and misleading evidence and faced with the pressure of a Chief of Police personally standing behind the credibility of her officers, allegations, a

reasonable prosecutor in DCA Miller's position would feel pressure to move forward with unsupported charges.

136.   The prosecution against Mr. Williams terminated in his favor when the Superior Court decided, after hearing the above evidence, that there was <u>no probable cause</u> to indict Mr. Williams for resisting arrest, unlawful assembly, or obstruction of a thoroughfare.

137.   There was, in fact, no probable cause to prosecute Mr. Williams for resisting arrest, unlawful assembly, or obstruction of a thoroughfare.

138.   The PPD Defendants, each and all of them, engaged in the above-described conduct with actual malice—namely, to cause harm to Mr. Williams, who they knew to be a deputy public defender and local community leader.

139.   As a proximate result of these Defendants' unlawful and unconstitutional conduct, Plaintiff suffered injuries and other damages and losses as described herein entitling Plaintiff to compensatory, economic, consequential and special damages in an amount to be determine at trial.

140.   Plaintiff is further entitled to his attorneys' fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

141.   Finally, in addition to compensatory, economic, consequential and special damages, Plaintiff is entitled to punitive damages against Defendants under 42 U.S.C. § 1983, in that the actions of these Defendants were taken maliciously, willfully, or with a reckless disregard of Plaintiff's constitutional rights.

### THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983 –First Amendment Retaliation
### (Against Defendants Williams, Gage, Magee, and Barrios)

142.   Plaintiff hereby incorporates by reference the allegations contained in the foregoing paragraphs as if they were fully set forth herein.

143. At the time of the complained-of events, the First Amendment to the United States Constitution clearly established Mr. Williams' rights to freedom of expression, assembly, and petition the government for grievances (as well as and to document the government response to those doing so).

144. At the time of the complained-of events, any reasonable officer in the positions of Defendants would know that this included the right to be free from retaliation for exercising his these rights.

145. On July 12, 2019, Mr. Williams was engaged in a constitutionally protected activity: He was attending an anti-Trump First Amendment demonstration and serving as a legal observer for the specific purpose of documenting police conduct.

146. As described herein, the actions of Defendants Williams, Gage, Magee, Barrios, and McBride caused Mr. Williams to be subject to (i) excessive and indiscriminate force, first when he was shoved multiple times while standing on the sidewalk, and later when he was thrown to the ground and piled on by multiple police officers; (ii) unlawful arrest and detention, when he was targeted for an arrest without probable cause, handcuffed, and booked into jail on multiple felony charges; and (iii) malicious prosecution, when despite having actual knowledge of his innocence Defendants proceeded in an attempted felony prosecution against him based on false evidence.

147. The conduct described herein—assaulting, arresting, and prosecuting a well-known and highly regarded local attorney and community leader based on false evidence—would chill a person of ordinary firmness from continuing to engage in the protected activity.

148. As a proximate result of these Defendants' unlawful and unconstitutional conduct, Plaintiff suffered injuries and other damages and losses as described herein entitling Plaintiff to compensatory, economic, consequential and special damages in an amount to be determine at trial.

149.    Plaintiff is further entitled to his attorneys' fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

150.    Finally, in addition to compensatory, economic, consequential and special damages, Plaintiff is entitled to punitive damages against Defendants under 42 U.S.C. § 1983, in that the actions of these Defendants were taken maliciously, willfully, or with a reckless disregard of Plaintiff's constitutional rights.

**FOURTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Municipal Liability under *Monell***
**(Against Defendant City of Phoenix Only)**

119.    Plaintiff hereby incorporates by reference the allegations contained in the foregoing paragraphs as if they were fully set forth herein.

120.    Municipal bodies are liable for constitutional violations under 42 U.S.C. § 1983 when execution of its official policy or custom deprives an individual of its rights protected by the Constitution.

121.    Such municipal liability exists when a city fails to properly train, supervise, or discipline its employees, amounting to a deliberate indifference to a plaintiff's constitutional rights.

*Official Policy or Custom:  First Amendment Retaliation Against Left-Wing Protestors*

122.    PPD's Tactical Response Unit ("TRU") is the group of police officers that PPD trains for the purposes of organizing and implementing protest responses.

123.    TRU is led by Lieutenant Benjamin Moore (known to his officers as the "Alpha Leader") and Sergeant Douglas McBride.

124.    PPD has a pattern and practice of deploying TRU in a manner that consistently violates the rights of left-leaning, or perceived left-leaning, protestors despite having actual knowledge of their biases.

125.    In October 2014, at a Black Lives Matter demonstration in downtown Phoenix to protest police brutality after a PPD officer's murder of Rumain Brisbon, PPD

officers (upon information and belief organized and led by TRU) indiscriminately and without warning or justification fired pepper bullets at peaceful protesters.

126. This protest response received extensive media coverage and was known to Phoenix City Council, the City Manager, and the Chief of Police—all of whom knew or should have known that such a violent response to peaceful exercise of First Amendment rights was illegal and unconstitutional. Although the City was aware of PPD's actions shortly after they occurred, the City took no steps to discipline, supervise, train, or otherwise control PPD to ensure that such actions did not repeat in the future.

127. On or about July 8, 2016, a group of Black Lives Matter protesters gathered in downtown Phoenix to demonstrate for racial justice after two viral videos depicted the killings of Alton Sterling and Philando Castile by police. PPD officers indiscriminately, without justification, and without providing any warnings to protesters began firing "less lethal" munitions and chemical weapons into the crowd.

128. PPD claimed to have deployed these chemical weapons not because individuals were using force or threatening to use force against officers or others, and not because PPD needed to use such force to effectuate arrests or detentions. Rather, PPD deployed these weapons as a "crowd-control measure."

129. This protest response got ample media coverage and was known to Phoenix City Council, the City Manager, and the Chief of Police—all of whom knew or should have known that such a violent response to peaceful exercise of First Amendment rights was illegal and unconstitutional. Although the City was aware of PPD's actions shortly after they occurred, the City took no steps to discipline, supervise, train, or otherwise control PPD to ensure that such actions did not repeat in the future.

130. Almost one year later, on the night of August 22, 2017, a force of approximately 900 Phoenix PD officers (upon information and belief organized and led by TRU) conducted an unannounced attack on a group of non-violent protesters, gathered to

demonstrate strong disagreement with President Trump.  During the course of this assault, Phoenix PD fired more than 590 kinetic and chemical projectiles into a crowd that included young children, pregnant women, disabled people, and elderly individuals.

131.    In one particularly notable act of violence, TRU Officer Christopher Turiano was captured on video shooting an anti-Trump protestor in the genitals.

132.    This protest response received broad national media coverage and was known to Phoenix City Council, the City Manager, and the Chief of Police—all of whom knew or should have known that such a violent response to peaceful exercise of First Amendment rights was illegal and unconstitutional.

133.    To address concerns about the protest response, City Manager Ed Zuercher hired an independent investigator (OIR Group, Inc.) to conduct a review of the protest response.

134.    Rather than proceeding with the investigation—and taking measures to discipline, supervise, train, or otherwise control PPD to ensure that such actions did not repeat in the future—Phoenix City Council *defunded* the OIR Group investigation and caused its termination before it began.

135.    With this ratification by City Council, TRU Officers created and distributed memorabilia featuring a custom-designed logo celebrating Officer Turiano's shooting of the anti-Trump protestor.  This logo (a) celebrated violence against protestors, (b) employed politicized speech in favor of President Trump, and (c) employed white supremacist hate speech.[3]

136.    TRU Lieutenant Benjamin Moore was aware that TRU officers had ordered an entire box of memorabilia celebrating violence against protestors.

---

[3] *See* https://www.phoenix.gov/citymanagersite/Documents/Challenge-Coin-Summary-Report-08-12-2021.pdf

137. Sergeant McBride—who supervised the PPD Defendants here on the night they arrested Mr. Williams—was one of a number of TRU officers later discovered to have trafficked in that anti-protestor memorabilia.

138. Though the City has, for the better part of a year, claimed that its officers' possession of this challenge coin is irrelevant to *Monell* claims against it, the knowledge and possession of TRU Leadership of this anti-protest bias is absolutely relevant.

139. More, Chief Williams herself had knowledge of these anti-protestor trophies before the 2019 Lights for Liberty vigil.

140. More, PPD specifically deployed this act of violence as a training tool for its young officers: In 2018—the year before Mr. Williams had his rights trampled by the PPD Defendants—the Phoenix Regional Police Academy showed the video of Officer Turiano's shooting to new recruits, and "celebrated" it as "something to look up to."[4]

141. The City engaged in deliberate indifference to Mr. Williams' constitutional rights by knowingly deploying TRU—a group of officers with established histories of violence and demonstrable bias against anti-Trump, left-leaning or perceived left-leaning protestors—to respond to an anti-Trump, left-wing protest.

142. The City's deployment of this group of biased officers—who, in addition to Mr. Williams, targeted and arrested two other non-violent protestors whose charges were also later dismissed (Phil Martinez and Jorge Soria)—to respond to the anti-Trump Lights for Liberty Protest was the moving force behind Mr. Williams' constitutional violations.

/ / /

---

[4] https://www.abc15.com/news/local-news/investigations/protest-arrests/phoenix-probing-if-challenge-coin-image-video-shown-at-academy

***Official Policy or Custom:  Levying False Accusations Against Police Violence Victims***

143.   In addition to the foregoing, the City of Phoenix Police Department has also propagated an official policy or custom of seeking aggravated assault charges against victims of police violence—upon information and belief in an effort to attempt to insulate itself from civil liability.

144.   In 2018, Marco Zepeda was viciously assaulted by a City of Phoenix Police Officer in a Quik Trip restroom when Mr. Zepeda bumped into him.

145.   After the altercation, the officer learned that Mr. Zepeda was blind and the bump into the officer was inadvertent.  Rather than permitting Mr. Zepeda to leave, the officer called in back-up, falsely claimed that Mr. Zepeda had assaulted him, and caused Mr. Zepeda to be arrested for aggravated assaulted—stranding his minor daughter at the Quik Trip without her father.

146.   The Maricopa County Attorney's Office refused to prosecute Mr. Zepeda. The City of Phoenix later settled Mr. Zepeda's and his daughter's cases for a total of $120,000.

147.    Mr. Zepeda's case spurned a New York Times exposé, identifying similar situations of untruthful allegations in the cases of Alex Andrich, Edward Brown, and Mohammad Muyhamin—all victims of police violence against whom Phoenix Police officers levied accusations of prior assaults.[5]

148.   In Mr. Andrich's case, Phoenix Police used lethal force against a man who they claimed had a weapon in his hand—which turned out to be an officer's handcuffs.[6]

149.   In Mr. Brown's case, Phoenix Police used lethal force against (and ultimately paralyzed) a man who the officer claims charged him and grabbed his gun, despite the fact that none of Mr. Brown's DNA had been found on the weapon and he had been shot in the

_____

[5] https://www.nytimes.com/2018/12/10/us/phoenix-police-shootings.html
[6] Id.

back. [7]

150.    In Mr. Muyhamin's case, Phoenix police claim that the man had "assaulted" an employee at a community center—and used that as justification to employ a fatal control hold that ultimately resulted in Mr. Muyhamin's death (and cost the City $5 million in a recent wrongful death settlement).

151.    In 2018, the Phoenix Police Department was the deadliest police force in the nation—and charged so many people with assault that the Maricopa County Attorney Office actually ultimately created a specialized prosecutorial unit (known as the "First Responders Bureau") dedicated to prosecuting crimes with police victims—and hired a City of Phoenix Police Commander, Tom Van Dorn, to lead it.

152.    PPD officers' custom of accusing excessive force victims of aggravated assault against officers has become so widespread that the City's failure to halt it—despite having actual knowledge of it *before* Mr. Williams' was arrested—amounted to a deliberate indifference of Mr. Williams' First Amendment rights.

153.    This custom was the moving force behind Mr. Williams' constitutional violations.

### *Deliberately Indifferent Failure to Train and Supervise*

119.    For years, PPD has empowered TRU to determine and conduct its own training with limited-to-no outside supervision or guidance.

120.    The City is aware that TRU officers are drawn from within Phoenix PD's Downtown Operations Unit ("DOU")—a unit whose primary responsibilities are serving as security for City buildings, issuing parking tickets, and crowd management following downtown sporting events and concerts.

---

[7] Id.

121.    Given the nature of their primary job duties, DOU officers are generally not selected for their skills in police work, training and experience in use-of-force, or understanding of human factors and psychology.

122.    Because DOU officers generally do not engage in the type of police work that requires frequent testimony, DOU has become a frequent landing-spot for "problem" officers with problematic issues—including histories of violence or credibility concerns that have landed them on the Maricopa County Attorney's Office's *Brady* list.

123.    Despite all of the foregoing, PPD provides *de minimis* specialized training to TRU officers:  Prior to the Lights for Liberty protest, all that was required for a DOU officer to qualify for a TRU assignment was 10 hours of "field force" training.

124.    Upon information and belief, the entirety of the 10 hours of the training that TRU officers received is provided by and within PPD itself:  It is not provided, designed, approved, or overseen by the Arizona Peace Officer Standards and Training Board ("AZPOST) or any other independent agency.

125.    Upon information and belief, the vast majority of the training provided to TRU officers is in practicing formations and proper use of protective equipment.

126.    Upon information and belief, TRU officers receive minimal-to-no training regarding specialized use-of-force concerns, effecting arrests in crowds, the psychology of protests, or constitutional considerations.

127.    Upon information and belief, TRU leadership receives minimal-to-no training regarding making determinations as to when it is appropriate to deploy TRU officers in riot-control gear, to create "skirmish line," and the impact on otherwise lawful First Amendment assemblies of TRU's presence and use of force.

128.    Upon information and belief, TRU leadership receives minimal-to-no training regarding the proper declaration of an "unlawful assembly"—which, under Arizona law, may only be properly declared when it has been determined that two or more persons have

engaged together to "recklessly use[] force or violence" or "threaten[] to use force or violence, if such threat is accompanied by immediate power of execution." *See* A.R.S. sections 13-2902 and -2903.

129.    As a result of this lack of training, PPD has adopted the unconstitutional practice of declaring non-violent First Amendment assemblies as "unlawful" without appropriate legal cause under Arizona law, resulting in their officers feeling justified in using force, effecting arrests when there is no probable cause to do so, and otherwise chilling the free-speech and -assembly rights of protestors within the City of Phoenix.

130.    As set forth herein, Mr. Williams was deprived of multiple constitutional rights under the First and Fourth Amendments.

131.    The City's deficient training of both TRU leadership (specifically, training them that deployment of TRU officers in riot gear was appropriate for a candlelight vigil with a small group of people engaged in an act of non-violent civil disobedience; and failing to train them regarding the appropriate declaration of an unlawful assembly under Arizona law) and TRU officers (training them to march in formation, directly into non-violent protestors, and force them to certain areas when they have committed no crimes) amounts to a deliberate indifference of the rights of persons with whom TRU officers are likely to come into contact.

132.    Mr. Williams' constitutional injury would have been avoided had the City of Phoenix properly trained these officers regarding the foregoing.

### *Ratification of False Arrest and Malicious Prosecution*

133.    As set forth herein, Chief Williams was actually aware of the defendant officers' false arrest of Mr. Williams:  She personally learned of the arrest, she was briefed on it, and she reviewed the evidence.

134.    Chief Williams expressly ratified the officers' unconstitutional conduct when she caused City Council to be advised that (a) she had conducted a review of the incident

and (b) she personally confirmed that the video evidence supported the false allegations that Mr. Williams had assaulted Sgt. Gage and Officer Magee and resisted their arrests.

135.    Moreover, as set forth herein, Chief Williams was actually aware of—and participated in—the defendant officers' provision of false information to Deputy Maricopa County Attorney Jeremy Miller.

136.    Chief Williams expressly ratified the officers' unconstitutional conduct when she authorized, expressly or implicitly, a re-investigation into Mr. Williams *after a sitting Maricopa County Superior Court Commission dismissed the charges as unsupported.*

137.    Moreover, as set forth herein, Mr. Williams' case was brought to Chief Williams attention, as well as to the attention of City Council itself.  Yet PPD did not initiate an investigation into or discipline any of the officers involved.  Instead, after PPD's false allegations against Mr. Williams were exposed, PPD promoted Sergeant Douglas McBride—who, by his own statements was the architect of the decision to arrest Mr. Williams based on his own false claims that he observed assaults that never happened—to TRU's "full-time training sergeant."

### FIFTH CLAIM FOR RELIEF
**Malicious Prosecution under Arizona law**
**(Against Defendants Williams, Gage, Magee, Barrios & City of Phoenix Only)**

138.    Plaintiff hereby incorporates by reference the allegations contained in the foregoing paragraphs as if they were fully set forth herein.

139.    As set forth above, Defendants Williams, Gage, Magee, Barrios (the "PPD Defendants") initiated and/or took active part in the criminal prosecution against Mr. Williams.

140.    As set forth herein, the PPD Defendants initiated and took part in these prosecutions despite the absence of probable cause.

141.    As set forth herein, the criminal prosecution against Mr. Williams terminated in his favor when the Court dismissed all charges against him.

- 30 -

142.    As set forth herein, the PPD Defendants acted with malice, causing Mr. Williams to be charged with two counts of resisting arrest, one count of obstructing a public thoroughfare, and one count of unlawful assembly despite a lack of probable cause to (a) insulate themselves from civil suit or administrative complaint arising out of their wrongful arrest and imprisonment of Mr. Williams, (b) attempt to damage the career and reputation of a vocal political opponent, (c) retaliate against Mr. Williams for the content of his political speech, (d) deter others who know and admire Mr. Williams from engaging in legal observing or participating in First Amendment assemblies, or (e) some combination of the above.

143.    As a direct and proximate result of these Defendants' malicious conduct, Mr. Williams was injured and suffered damages in an amount to be proven at trial.

### SIXTH CLAIM FOR RELIEF
**Invasion of Privacy – False Light under Arizona law**
**(Against the City of Phoenix Only)**

144.    Plaintiff hereby incorporates by reference the allegations contained in the foregoing paragraphs as if they were fully set forth herein.

145.    As set forth herein, employees of Defendant City of Phoenix—including without limitation Defendants Williams, Gage, Magee, and Barrios—acting in the course and scope of their employment, made false and misleading public statements against Mr. Williams, namely, that he had assaulted and resisted the arrest of two police officers at the Lights for Liberty vigil.

146.    As set forth herein, the City of Phoenix made these false and misleading statements with actual:  to attempt to harm Mr. Williams and cover-up its officers' misconduct.

147.    PPD employees made these false and misleading statements to Phoenix City Council and the Mayor of Phoenix, with whom Mr. Williams actively worked as a

- 31 -

community leader and member of multiple City Committees.

148. PPD employees made these false and misleading statements to the Maricopa County Attorneys' Office, with whom Mr. Williams actively worked on a daily basis as a public defender.

149. PPD employees made these false and misleading statements to Maricopa County Superior Court staff, with whom Mr. Williams actively worked on a daily basis as a public defender.

150. More, the City of Phoenix did not make these statements in a few isolated public records, but made a PPD spokesperson available to speak to the media about the arrests.[8]

151. These statements created a false impression about Mr. Williams—i.e., that he had engaged in violence and committed aggravated assaults against, and resisted the arrests of, two police officers.

152. The impression created about Mr. Williams would be highly offensive to any reasonable person who had dedicated his career and life to peacefully working for criminal justice reform, both inside and outside of the courtroom.

153. The false and misleading statements caused Mr. Williams to be damaged and negatively impacted his community standing, professional reputation, emotional well-being, and mental health.

154. At the time the false statement was made, the City's employees either knew the statement would create a false impression of Mr. Williams or acted in reckless disregard of the fact that their statement would create a false impression of Mr. Williams.

---

[8] *See, e.g.*, https://www.12news.com/article/news/16-arrested-after-downtown-phoenix-immigration-protest-friday-night/75-9f0a1fcf-97c6-4ca3-a7d5-45bf1a04dcb1

## SEVENTH CLAIM FOR RELIEF
### Intentional Infliction of Emotional Distress
### (Against Defendant City of Phoenix Only)

155. Plaintiff hereby incorporates by reference the allegations contained in the foregoing paragraphs as if they were fully set forth herein.

156. As set forth above, employees of Defendant City of Phoenix—including without limitation Defendants Williams, Gage, Magee, and Barrios—acting in the course and scope of their employment, engaged in a series of acts that an average member of the community would regard as atrocious, intolerable in a civilized community, and beyond all possible bounds of decency.

157. Specifically, PPD officers and employees (a) assaulted Mr. Williams and his fiancé at a peaceful candlelight vigil after they had obeyed officer commands to move to the sidewalk; (b) grabbed Mr. Williams, piled on top of him, and arrested him; (c) transported him to jail and caused him to be arrested for charges he did not commit; (d) made public statements about Mr. Williams' arrest; (e) misled City Council into believing that the charges were supported by the video evidence; (f) lied in police reports to convince prosecutors to charge him with felonies; (g) withheld the vital evidence from prosecutors that would have revealed these lies, the officers' lack of credibility, and Mr. Williams' innocence; (h) pressured prosecutors into proceeding with felony prosecution against Mr. Williams for six weeks based on false evidence; and (hi) only admitted that the charges were false on cross-examination at a probable cause hearing.

158. The aforementioned conduct was intentional insofar as it intended to cause Mr. Williams emotional distress.

159. The aforementioned conduct was reckless because those engaging in it were aware of and consciously disregarded the near certainty that it would cause Mr. Williams emotional distress.

160. The aforementioned conduct did, indeed, cause Mr. Williams to suffer emotional distress, as it would any reasonable person in his position.

161. Mr. Williams' emotional distress included the stress, anxiety, and psychological anguish of worrying that the full force of the Phoenix Police Department— supported by the desires of the Chief of Police herself and with the knowledge and abdication of City Council—would be able to secure an unlawful indictment against him that might ultimately compromise his law license.

162. As a direct and proximate result of these actions, Mr. Williams was injured and suffered damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Jamaar Williams requests that the Court enter judgment against Defendants as follows:

    a. For damages in an amount to compensate Plaintiff fully and fairly for the violations of his Constitutional Rights;

    b. For general, consequential, special, and compensatory damages, including but not limited to his pain and suffering, mental anguish, emotional suffering, and loss of enjoyment of life;

    c. For nominal damages as provided for by law;

    d. For punitive damages in an amount sufficient to punish defendants and deter them from similar unconstitutional and unlawful conduct in the future;

    e. For prejudgment interest on all liquidated sums;

    f. For attorneys' fees under 42 U.S.C. §§ 1983 and 1988;

    g. For Plaintiff's costs and other expenses incurred in this action; and

    h. Such other and further relief as the Court deems just.

/ / /

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38, Fed. R. Civ. P., Plaintiff Jamaar Williams hereby demands that this matter be tried to a jury.

DATED this 5th day of May, 2022.

THE PEOPLE'S LAW FIRM
645 North 4th Avenue, Suite A
Phoenix, Arizona  85003

By:/s/ Stephen D. Benedetto
    Stephen D. Benedetto

*Attorneys for Plaintiff Jamaar Williams*